UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| XL SPORTS WORLD, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24-cv-00157-SDN |
| | ) | |
| DYNAMIC SPORTS | ) | |
| CONSTRUCTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION TO DISMISS

Plaintiff XL Sports World, LLC ("XL") sued Dynamic Sports Construction, Inc. ("Dynamic") over Dynamic's allegedly botched replacement of basketball court flooring in XL's Saco, Maine, facility. XL claims Dynamic failed to properly evaluate the facility and conducted insufficient moisture testing of the three basketball courts' subsurface. Dynamic's improper installation resulted in unevenness, bubbling, and chipping in the new flooring.

Dynamic now moves to dismiss, arguing their written construction agreement bars XL's claims by expressly excluding responsibility for moisture problems. XL argues the written agreement is only part of the story. In XL's view, the parties' contractual relationship should be viewed in light of the fact that a Dynamic employee conducted pre-installation moisture testing and told XL that Dynamic's flooring product was suitable for the job. XL further submits that Dynamic installers noticed excessive moisture while replacing the flooring but failed to conduct any further moisture testing. XL argues these statements and conduct either modified the contractual relationship to eliminate Dynamic's written exclusion clause or formed a new quasi-contract entitling XL to relief.

1

In addition, XL argues some of the paint damage is unrelated to moisture altogether and therefore is not covered by the exclusion clause.

For the following reasons, I grant in part and deny in part Dynamic's motion to dismiss.

## BACKGROUND

### I.    Factual Background[1]

XL is a North Carolina company that owns and operates an indoor sports facility in Saco, Maine, through a subsidiary. ECF No. 26 at 1, ¶¶ 1–2. Dynamic is a Texas company that installs sports flooring. *Id*. at 1, ¶ 3. XL sought to replace the flooring for three of the Saco facility's basketball courts, along with a "training section." *Id*. at 2, ¶ 7.

The timeline of relevant events as outlined in the Amended Complaint is murky. On September 14, 2021, Dynamic employee Kirby Foray toured the Saco facility. *Id*. at 2, ¶ 6. During that visit, Mr. Foray stated Dynamic flooring would be appropriate for the project. *Id*. XL claims that on October 14, 2021, XL and Dynamic contracted for Dynamic to replace the flooring. *Id*. at 2, ¶ 7.

The parties signed a written agreement (the "Agreement") reflecting their contract. *Id*. at 2, ¶ 7. The Agreement states prominently on the first page that it was "made as of the 22th [sic] day of September in the year 2021." ECF No. 27-2 at 2. XL's owner signed

---

[1] I draw these facts from "the [amended] complaint . . . and documents expressly incorporated into it." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014). I take the alleged facts as true and draw all reasonable inferences from them. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

XL did not attach the written contract governing Dynamic's work to the Amended Complaint. ECF No. 26. Instead, Dynamic attached the contract to its motion to dismiss. ECF No. 27-2. XL does not dispute the authenticity of that document and both parties agree it forms at least part of the contractual relationship between the parties. Therefore, the Court may consider the document without converting this motion to dismiss into a motion for summary judgment. *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013).

the Agreement on September 23, 2021. *Id.* at 4. Mr. Foray signed on behalf of Dynamic on October 14, 2024. *Id.* at 3.

At some point (the Amended Complaint does not say when), Mr. Foray measured water vapor levels in the floor of the Saco facility using a Tramex Moisture Meter. ECF No. 26 at 2, ¶ 12. XL alleges it relied on Mr. Foray's testing in contracting with Dynamic, *id.* at 3, ¶ 18, which implies Mr. Foray conducted his testing before October 14, 2021, the date on which XL claims the parties contracted.[2] XL also alleges Mr. Foray made some statements about the suitability of Dynamic flooring during the September 14, 2021, facility visit, *id.* at 2, ¶ 6, which suggests Mr. Foray conducted his measurements on that same day.

On the other hand, XL argues that Mr. Foray's testing "modified" or "negated" specific terms of their written contract, ECF No. 30 at 4–5, which implies Mr. Foray tested the moisture levels *after* the parties entered into the Agreement on October 14, 2021.[3] Indeed, XL describes "Mr. Foray's September 14, 2021 representations and *his subsequent testing*," *id.* (emphasis added), suggesting Mr. Foray conducted testing on a later date than his initial September 14th visit. While at this stage the Court must take the Complaint's allegations as true and draw reasonable inferences in favor of XL, which timeline is more favorable to XL's claims is not yet clear.

Whenever Mr. Foray may have conducted his testing, XL alleges he claimed at every reading that the moisture level fell within Dynamic's moisture tolerance limit, which

---

[2] XL's owner signed the Agreement on September 23, 2021, three weeks before XL claims the parties contracted. Therefore, I could infer that Mr. Foray conducted his testing before September 23, because XL allegedly relied on Mr. Foray's testing in deciding to contract.

[3] Another possibility is that Mr. Foray conducted his testing between September 23 (when XL signed the Agreement) and October 14 (when Dynamic signed the Agreement).

would allow Dynamic to install its flooring. ECF No. 26 at 2, ¶¶ 12–13. However, the Tramex Moisture Meter he used only measures near-surface moisture, which is inadequate to determine if a surface is sufficiently dry to install flooring. *Id.* at 3, ¶¶ 14–15. Nonetheless, after the moisture testing, Mr. Foray told XL that Dynamic's DynaForce flooring system would be suitable for XL's Saco facility. *Id.* at 3, ¶ 17. XL relied on Mr. Foray's statements in deciding to contract with Dynamic. *Id.* at 3, ¶ 18.

For Dynamic to install the new flooring, XL had to shut down its basketball courts for seventeen days. *Id.* at 3, ¶ 20. As Dynamic installers began to work, they observed moisture in the installation area. *Id.* at 3, ¶ 21. Accordingly, they asked XL to dry out the area using dehumidifiers and carpet dryers. *Id.* However, they did not conduct any further moisture testing and ultimately completed the installation as planned on November 24, 2021. *Id.* at 3–4, ¶¶ 22–26.

Soon after, XL observed defects such as "extreme scuffing and unevenness" in the newly installed flooring. *Id.* at 4, ¶ 27. A Dynamic employee attempted to clean the flooring with a specialized machine but could not fix either problem. *Id.* at 4, ¶ 28. Accordingly, between February 28, 2022, and March 9, 2022, Dynamic recoated the flooring under its contractual warranty obligations. *Id.* at 4, ¶¶ 29–30. Still, Dynamic did not conduct any further moisture testing during the warranty work. *Id.* at 4, ¶ 35. Nor did Dynamic attribute any of the defects to moisture. *Id.* at 4, ¶ 34. During the warranty work, XL shut down its courts for another ten days, resulting in $24,872.75 in losses. *Id.* at 4, ¶ 31.

Five days after Dynamic completed the warranty work, the paint on the floors began to chip. *Id.* at 5, ¶ 36. Since then, XL has conducted testing showing significant moisture in the concrete subfloor. *Id.* at 5, ¶ 37. While XL does not allege what caused the

4

chipping paint, XL alleges the moisture caused "bubbling and unevenness" in the flooring because, according to XL, DynaForce flooring is not suitable for such moist environments. *Id.* at 5, ¶¶ 38–39. The damage to the flooring is so severe that XL alleges it must replace the floor completely. *Id.* at 5, ¶¶ 42–43. Accordingly, XL claims Dynamic caused a total of $198,010.75 in damages. *Id.* at 5, ¶ 45.

A few provisions of the Agreement are particularly relevant here. Under the heading "Exclusions," the Agreement limits Dynamic's liability for certain types of damages or defects, including those related to moisture:

> [Dynamic] shall not provide and/or *shall not be responsible for any damage, defect*, failure, or undue wear in or to the Surface *caused by or connected with the following*: (a) Improper or insufficient design or engineering, or improper or insufficient project drawings, plans, existing base or surface under the Surface covered by this contract, (b) the inherent characteristics of the surface or other supporting materials upon which the Surface is installed, . . . (f) *moisture accumulation under the surface which may cause: 1) bubbles under the Surface, 2) adhesion problems, [or] 3) other problems or failures not related to defects in materials.*

ECF No. 27-2 at 1 (emphasis added). Referencing those exclusions, the Agreement further explains: "[XL is responsible for the above listed exclusions and hereby agrees to defend, indemnify and save and hold harmless [Dynamic], [its] agents, owners, employees, directors, officers and assigns from and against all claims, costs, expenses and liabilities with respect to [XL's] failure to make provision for the above-listed exclusions . . . ." *Id.* at 2. Finally, under the heading "Warranty," the Agreement purportedly limits its one-year warranty by disclaiming liability for moisture damage:

> Dynamic . . . will warrant its materials and workmanship against defects for a period of one (1) year. Unless [Dynamic] is hired to install a vapor barrier [Dynamic] *accepts no responsibility for moisture accumulation underneath the synthetic surface after installation*, which may cause bubbles under the material, adhesion failures or other failures not related to defects in the material.

*Id.* at 2 (emphasis added).

5

## II.    Procedural History

XL filed this lawsuit in the York County Superior Court on April 23, 2024. Dynamic invoked diversity jurisdiction to remove the case to this Court on May 3, 2024. ECF No. 1. On October 16, 2024, XL filed an Amended Complaint with Dynamic's consent. ECF No. 26. Dynamic moved to dismiss. ECF No. 27. XL responded, ECF No. 30, and Dynamic replied, ECF No. 31.

The Amended Complaint alleges six claims: breach of contract, breach of warranty, unjust enrichment, breaches of express and implied warranties, negligence, and negligent misrepresentation. XL listed two separate causes of action for "breach of warranty" and "breaches of express and implied warranties." ECF No. 26 at 6, 8. The first warranty cause of action alleges Dynamic breached its warranty that flooring would be installed in a "workmanlike manner." *id.* at 6. The second warranty cause of action is more specific, claiming Dynamic breached its warranty that the flooring was suitable for XL's needs and would last for fifteen years. The second warranty cause of action also specifically cites to 11 M.R.S. §§ 2-313 to 2-315 (adopting Uniform Commercial Code provisions regarding warranties). The Amended Complaint identifies two different claims as "Count IV." ECF No. 26 at 8–9. For that reason, I avoid referring to any of XL's claims by the numbered counts.[4]

---

[4] The first count of the Amended Complaint for "Breach of Contract" states that it "repeats and realleges Paragraphs 1 through 33 of the Complaint as if set forth fully herein." ECF No. 26 at 6, ¶ 47. That attempt to incorporate the Amended Complaint's general allegations into a specific count fails to mention thirteen paragraphs (from thirty-four to forty-six) that XL surely wanted to include. *See, e.g.*, *id.* at 4–5, ¶¶ 36 (alleging paint chipping), 37 (alleging testing showing water vapor), 40 (alleging Dynamic's work was defective), 45 (alleging the total damages). Because Dynamic did not object to that issue, I decide this motion based on all of the Amended Complaint's "factual allegations and the legal claims pled based on said allegations." *United States ex rel. Est. of Cunningham v. Millennium Lab'ys of California, Inc.*, 713 F.3d 662, 664 n.2 (1st Cir. 2013); *cf. Kuehl v. F.D.I.C.*, 8 F.3d 905, 908 (1st Cir. 1993) ("Our federal rules promote the disposition of claims on the merits rather than on the basis of technicalities . . . .").

## DISCUSSION

Dynamic moves to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The Court applies a two-step inquiry to resolve such motions: First, "isolate and ignore statements in the complaint that simply offer legal labels and conclusions." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Second, "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id.*

### I.    Breach of Contract

XL claims Dynamic breached its contractual obligations by performing defective testing and installation, providing a defective product, and failing to conduct its work, including testing, within industry standards. *See* ECF No. 26 at 6, ¶ 49. XL's claims largely stem from damage to the flooring allegedly caused by excessive moisture. However, XL also argues some paint damage "stems from improper paint application, and is wholly unrelated to moisture and design or engineering of the subsurface." ECF No. 30 at 6.

Dynamic argues the Agreement's exclusion clause bars XL's contract claims. The exclusion clause states:

> [Dynamic] shall not provide and/or shall not be responsible for any damage, defect, failure, or undue wear in or to the Surface caused by or connected with . . . [i]mproper or insufficient design or engineering, or improper or insufficient . . . existing base or surface . . . [or] moisture accumulation under the surface.

ECF No. 27-2 at 1.[5]

---

[5] Dynamic also cites to the Agreement's warranty clause in support of its position. The warranty clause provides, under the "Warranty" heading, that "[u]nless [Dynamic] is hired to install a vapor barrier [Dynamic] accepts no responsibility for moisture accumulation underneath the synthetic surface after

7

XL raises two theories for why the exclusion clause does not bar its claims. First, XL argues the exclusion clause, by its terms, does not apply to damage that proper moisture testing would have uncovered and prevented or to damage caused by improper paint application. Second, XL argues that that Dynamic "expanded its contractual obligations" by conducting moisture testing before (or perhaps after) the parties entered the Agreement and therefore "negated" any limitation on liability the exclusion clause provided as to the breach of contract claim. ECF No. 30 at 3–5.

## A. Applicable law

Texas law governs XL's breach of contract claim. The Agreement contains a choice-of-law provision: "This contract shall be governed by the laws of the State of Texas." ECF No. 23-2 at 3. XL noted that Texas law applies, while Dynamic said nothing as to the governing law. The Court's independent analysis confirms the choice-of-law provision applies. Because this is a diversity case, I apply Maine law to determine whether the choice-of-law provision is valid. *See DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 419 (1st Cir. 2024). Under Maine law, a court must enforce a contractual choice of law provision unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Sebascodegan Enters., LLC v. Petland, Inc.*, 647 F. Supp. 2d 71, 74 (D. Me. 2009) (quoting *Schroeder v. Rynel, Ltd., Inc.*, 720 A.2d 1164, 1166 (Me. 1998)). Here, Texas has a "substantial relationship to the parties" because

---

installation." ECF No. 27-2 at 2. It is not clear whether this clause would apply to contractual claims in addition to warranty claims. In any event, it does not apply here by its own terms because XL alleges the moisture was present *before* Dynamic installed the flooring, not after.

Dynamic is a Texas corporation with its principal place of business in Texas. *Id.* (finding a substantial relationship to Ohio because one party was incorporated and had its principal place of business there); *see* ECF No. 6. Neither party has claimed applying Texas law would be contrary to any other state's policy. Accordingly, Texas law governs.

**B. The Agreement's exclusion clause covers most of the alleged damage.**

Before addressing whether Dynamic's conduct negated the exclusion clause's limitation of liability, I must determine whether the text of the exclusion clause applies to the alleged damage. Under Texas law, courts "presume that parties intend what the words in their contract say, and . . . interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs otherwise." *Equistar Chemicals, LP v. ClydeUnion DB, Ltd.*, 579 S.W.3d 505, 522 (Tex. App. 2019) (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)). Therefore, I interpret the Agreement's exclusion clause according to those principles.

*1. Bubbling and unevenness*

The Agreement's exclusions are broad, disclaiming responsibility for any damage "connected with . . . moisture accumulation under the surface." ECF No. 27-2 at 1. XL alleges that "water vapor" in the "concrete below the flooring system" caused the bubbling and unevenness it complains of. If water vapor in the concrete *below* the flooring system caused bubbling and unevenness, then that bubbling and unevenness is "connected with" moisture accumulation *under* the surface. Therefore, the Agreement's exclusion clause covers the bubbling and unevenness in the flooring.

XL argues that the exclusion clause does not cover Dynamic's improper moisture testing itself, which is what began the chain of events leading to bubbling and unevenness. That is, "Dynamic should have realized that the presence of moisture could seriously

9

impact the functionality of the DynaForce flooring system. A reasonable flooring installer would have sought further testing given the presence of moisture." ECF No. 26 at 3–4, ¶¶ 24–25.

This argument fails for two reasons. First, it is beside the point. As described above, moisture testing is "connected with" moisture accumulation because moisture testing detects the presence or absence of moisture accumulation. Therefore, the exclusion clause's plain words cover the moisture damage, no matter how XL characterizes the damage's root cause. Second, XL's own allegations confirm the moisture Dynamic failed to test for is present under the surface of the installed flooring. For example, XL alleges "[s]ubsequent testing has revealed that significant levels of water vapor [are] present in the concrete *below the flooring system*." ECF No. 26 at 5, ¶ 37 (emphasis added). Indeed, one of XL's chief complaints with Dynamic's testing is that Dynamic used a moisture meter that only measured moisture "at and immediately below" the surface. *Id.* at 3, ¶ 14. However, the exclusion clause disclaims responsibility for moisture in precisely that location: moisture "under the surface." ECF No. 27-2 at 1. Therefore, the plain text of the exclusion clause covers bubbling and unevenness in the flooring.

## 2. *Paint Chipping*

The Agreement's exclusion clause does not cover XL's allegations of paint chipping. Dynamic suggests that because the Agreement warns moisture can cause "adhesion failures," the Court must infer moisture caused the paint chipping damage. Were that inference permissible, the exclusion clause would apply. However, XL does not allege what caused the paint chipping, and I see no reason to infer that moisture is the culprit. First, while the Agreement warns that moisture *may* cause such damage, it does not follow that any paint chipping *must* be the result of moisture. Second, to the extent

Dynamic asks the Court to make any factual inference as to the cause of paint damage, the Court may not do so to XL's detriment at this stage. *Schatz*, 669 F.3d at 55. Accordingly, the plain text of the exclusion clause does not cover damage related to paint chipping. The breach of contract claims stemming from such damage survive Dynamic's motion to dismiss.

### C. Dynamic's statements and conduct did not negate the Agreement's exclusion clause.

XL argues that Mr. Foray's moisture testing and representations that the moisture levels were suitable constitute part of the contractual relationship between the parties. In XL's view, Mr. Foray negated the Agreement's exclusion clause, rendering it ineffective as to moisture damage, including the bubbling and unevenness that the clause's terms cover. ECF No. 30 at 3–4. XL's argument is unavailing.

Under Texas law, if a written contract "can be given a definite or certain legal meaning" from its four corners alone, the Court must give effect to its terms as written. *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). Otherwise, courts risk failing to "give effect to the parties' intentions as expressed in the document." *Id.*

That interpretive principle holds true even when the parties produce evidence of an earlier agreement or negotiation. The parol evidence rule provides that such evidence cannot displace the terms of a subsequent written contract.[6] *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App. 2005). The rule applies whenever the parties have "integrated their agreement into a single written memorial"—that is, when "all prior

---

[6] Despite its name, the parol evidence rule is a rule of substantive contract law, not evidence. *Baroid Equip., Inc.*, 184 S.W.3d at 13.

[oral or written] agreements relating to the transaction have been merged into" the final written agreement. *Id.*

Faced with a written agreement, courts applying Texas law presume "all prior agreements relating to the transaction have been merged into" the written document. *Baroid Equip.*, 184 S.W.3d at 13. Two circumstances can further support that presumption. First, a so-called merger[7] clause in the subsequent written agreement reflecting the parties' intent to supersede prior agreements makes the parol evidence rule barring consideration of those prior agreements "particularly applicable." *Id.* Second, if the terms of the subsequent written agreement "are so inconsistent with the first" agreement or negotiation that both cannot coexist, the subsequent agreement is "conclusively presumed" to supersede anything prior. *Smith v. Smith*, 794 S.W.2d 823, 828 (Tex. App. 1990).

As explained above, it is not clear exactly when Mr. Foray conducted moisture testing in relation to when the parties entered the Agreement—before or after. One could read XL's arguments to apply to either situation, although the ultimate conclusion—that the exclusion clause applies—is the same.

On the first side of the analysis, if Mr. Foray made his tests and representations before the parties entered the Agreement, the parol evidence rule applies and XL's claim fails. First, Texas law presumes any prior agreements merged into the written Agreement.

---

[7] Courts often use the words "merger" and "integration" interchangeably. *See Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 395 (Tex. App. 2004) (referring to a "merger/integration clause"). *Compare Smith v. Smith*, 794 S.W.2d 823, 827 (Tex. App. 1990) (referring to a "merger provision" that explains a contract "contains the entire agreement between the parties"), *with id.* at 828 ("An integration clause is in essence the merger doctrine memorialized."), *and with Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 679 (Tex. App. 1984) (rejecting argument that a "written contract is not integrated because the merger clause does not cover the subject matter").

*See Baroid Equip.*, 184 S.W.3d at 13. Second, the relevant terms are inconsistent: As explained above, the Agreement absolves Dynamic of liability for damage "connected with" moisture, including defective testing for moisture, while XL argues Mr. Foray's conduct and representations created an affirmative obligation to properly test for moisture. That obligation is inconsistent with the Agreement's exclusion of responsibility for problems connected with moisture, therefore supporting the presumption of merger. *See Smith*, 794 S.W.2d at 828. The lack of an explicit merger clause does not disturb this conclusion. *Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894, 899 (Tex. App. 2007) ("[E]ven in the absence of an express merger clause, all prior oral and written agreements are presumed to merge into a subsequent written contract.").

Because all prior agreements merged into the Agreement, and because evidence of Mr. Foray's earlier conduct and representations would "vary, alter, or supplement the terms" of this "otherwise unambiguous contract," the parol evidence rule prevents the Court from considering such evidence. *DeClaire v. G & B Mcintosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App. 2008).

If, of the other hand, XL is arguing that Mr. Foray conducted moisture testing and represented Dynamic's product was fit for the job *after* the parties entered the Agreement, the parol evidence rule does not apply. *First Bank v. Brumitt*, 519 S.W.3d 95, 111 (Tex. 2017) ("The parol-evidence rule 'does not apply to agreements made *subsequent* to the written agreement.'" (quoting *Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex. 1979))). In that case, XL argues Mr. Foray's conduct and representations "modified" the already-made Agreement. ECF No. 30 at 4. To be sure, subsequent oral agreements can sometimes modify earlier written ones, as XL suggests. *Hyatt Cheek Builders-Eng'rs Co. v. Bd. of Regents of Univ. of Texas Sys.*, 607 S.W.2d 258, 265 (Tex. Civ. App. 1980).

However, a modification "must satisfy the traditional requirements of a contract—there must be a meeting of the minds supported by consideration." *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App. 2008). Here, nothing in XL's Amended Complaint indicates XL provided consideration supporting a post-Agreement modification. Instead, XL seems to be claiming that Dynamic signed the Agreement excluding responsibility for moisture testing, and then unilaterally modified the Agreement to negate that written exclusion clause, for nothing in return. Without consideration, there can be no modification. If Mr. Foray's testing and representations took place after the parties entered the Agreement, then no modification occurred and the Agreement's exclusion clause still stands.

Therefore, no matter when Mr. Foray conducted his testing, the Agreement's exclusion clause bars XL's contract claims as to moisture-connected damage. If the testing was prior to the signed Agreement, the parol evidence rule bars consideration of the relevant conduct and statements; if the testing came after the signed Agreement, that conduct and those statements lack legal effect in the absence of consideration. For these reasons, XL's breach of contract claim as to bubbling and unevenness in the flooring is dismissed.

## II.    Unjust Enrichment and Quasi-Contract

XL raises unjust enrichment as a separate cause of action, claiming Dynamic kept XL's payment for the flooring even though the damage rendered the flooring less valuable than XL paid. ECF No. 26 at 7, ¶¶ 61–65. XL also argues a quasi-contract theory in an attempt to save its breach of contract claims. Because unjust enrichment is a type of quasi-contract remedy, I address both theories together here.

Texas law does not necessarily apply to the quasi-contract theory, because choice-of-law provisions in written contracts do not apply to non-contract claims. *Dinan v. Alpha Networks, Inc.*, 764 F.3d 64, 69 (1st Cir. 2014). And a quasi-contract, despite its name, is not exactly a contract. *Id.* at 68 (acknowledging similarities between a quasi-contract claim and breach of contract claim but concluding quasi-contracts are not governed by choice-of-law provisions); *see also Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App. 2006) (describing a quasi-contract as "a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties"). The parties themselves do not address the choice-of-law question on this topic. In any event, the Court need not definitively resolve which state's substantive law applies because the "resolution would be identical under [any potential] state's law." *Fratus v. Republic W. Ins. Co.*, 147 F.3d 25, 28 (1st Cir. 1998). Maine (the location of the facility), North Carolina (XL's domicile), and Texas (Dynamic's home state) are the three potential sources of governing law.

In all three states, the existence of an express contract covering the same ground bars recovery under a quasi-contract theory, including those based on unjust enrichment. *See Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988) (noting that a quasi-contract claim for unjust enrichment must fail when "there is a contract between the parties"); *First Union Nat. Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App. 2005) (explaining there can be no unjust enrichment "when a valid, express contract covers the subject matter of the parties' dispute" because "parties should be bound by their express agreements"); *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271 ("Unjust enrichment describes recovery for the value of the benefit retained *when there is no contractual relationship*, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay . . . ." (emphasis added)). Therefore,

the existence of the Agreement—an express contract—bars recovery under XL's quasi-contract and unjust enrichment theory. XL's unjust enrichment claim is dismissed.

### III.    Breach of Warranty

XL claims Dynamic breached express and implied warranties. ECF No. 26 at 6–8, ¶¶ 54, 58, 81. XL and Dynamic cite to both Maine and Texas law regarding warranties. Both states have adopted the relevant Uniform Commercial Code (UCC) provisions. *See generally* 11 M.R.S.A. § 2-101 (2025); Tex. Bus. & Com. Code Ann. § 2.101 (West 2023). Therefore, the Court need not resolve which state's law applies, as the analysis is the same under either law.[8] *See Fratus*, 147 F.3d at 28.

### A. Express Warranty

XL claims that Dynamic's "express statements, assertions, marketing materials, and representations concerning the DynaForce flooring" constitute express warranties. ECF No. 26 at 8, ¶ 70. A seller can create an express warranty in three ways:

First, "[a]ny affirmation of fact or promise . . . to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation." 11 M.R.S.A. § 2-313(1)(a); Tex. Bus. & Com. Code Ann. § 2.313(a)(1). Second, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 11 M.R.S.A. § 2-313(1)(b); Tex. Bus. & Com. Code Ann. § 2.313(a)(2). Third,

---

[8] Article 2 of the UCC only applies to "goods." 11 M.R.S.A. § 2-102 (2025) ("[T]his Article applies to transactions in goods . . . ."); Tex. Bus. & Com. Code Ann. § 2.102 (West 2023); *see Smith v. Urethane Installations, Inc.*, 492 A.2d 1266, 1269 (Me. 1985). When a transaction involves both the sale of goods and services—a so-called hybrid transaction—courts must determine whether the "predominant feature," *Smith*, 492 A.2d at 1269, "dominant factor," or "essence," *Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 901 (5th Cir. 2004), of the transaction relates to goods, or to services. Because neither party briefed this issue, and the question is close enough that it would be challenging to determine the "predominant feature" of this transaction without further factual development, the Court does not address it at this stage and assumes the UCC applies for the purposes of resolving this motion.

"[a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model." 11 M.R.S.A. § 2-313(1)(c); Tex. Bus. & Com. Code Ann. § 2.313(a)(3). The common thread is that an affirmation, description, or sample must form part of the "basis of the bargain" to create an express warranty. *Cuthbertson v. Clark Equip. Co.*, 448 A.2d 315, 321 (Me. 1982); *see also Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008).

"In general, the question whether certain language creates an express warranty is reserved for the trier of fact." *Cuthbertson*, 448 A.2d at 320; *see PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 100 (Tex. 2004). Only in the limited circumstances where reasonable minds could not disagree on the factual basis for the warranty may a contract effectively disclaim warranties as a matter of law. *Cuthbertson*, 448 A.2d at 320.

Here, it is not clear which statements, assertions, marketing materials, and representations XL intends to base its claim for an express warranty on. The Court need not speculate; it is enough at this stage that XL alleges Mr. Foray made various statements concerning the suitability of Dynamic's flooring. Reasonable minds could disagree on the import of those statements and their effect on the parties' bargaining. *See id.*; *PPG Indus.*, 146 S.W.3d at 100. Therefore, I cannot resolve the express warranty claims as a matter of law at this juncture. Dynamic's motion to dismiss the express warranty claims is denied.

### B. Implied Warranty

XL claims Dynamic established an implied warranty of fitness for a particular purpose when Mr. Foray conducted moisture testing and represented Dynamic's flooring was suitable for installation. *See* ECF No. 30 at 7–8. While Dynamic argues the

17

Agreement disclaimed any implied warranties, XL argues the disclaimer is insufficiently "conspicuous." *Id*. at 8.

The implied warranty of fitness for a particular purpose exists when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Tex. Bus. & Com. Code Ann. § 2.315; 11 M.R.S.A. § 2-315. "[T]o exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Tex. Bus. & Com. Code Ann. § 2.316(b); 11 M.R.S.A. § 2-316(2). The UCC supplies an example of "sufficient" conspicuous language: "There are no warranties which extend beyond the description on the face hereof." Tex. Bus. & Com. Code Ann. § 2.316(b); 11 M.R.S.A. § 2-316(2).

Whether a disclaimer is adequately conspicuous is a question of law. *Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex. 1990); *see J.S. McCarthy Co. v. Brausse Diecutting & Converting Equip., Inc.*, 340 F. Supp. 2d 54, 58 (D. Me. 2004) (concluding disclaimer of implied warranty sufficiently conspicuous as a matter of law on motion to dismiss).

Under the "Warranty" heading, in italic typeface and the same font size as other clauses, the Agreement states that Dynamic "accepts no responsibility for moisture accumulation underneath the synthetic surface after installation, which may cause bubbles under the material, adhesion failures or other failures not related to defects in the material." ECF No. 27-2 at 3. However, this alleged disclaimer of warranty is insufficiently conspicuous for several reasons.

First, although the disclaimer is contained under the "Warranty" subheading, the disclaimer itself does not actually contain the word warranty or the phrase "fitness for a particular purpose." *See Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20, 22 (Tex. App.

18

1982) (finding limitation of warranty conspicuous where it stated in all caps, "SELLER MAKES NO OTHER WARRANTY OF ANY KIND, EXPRESS OR IMPLIED"); *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 108 (D. Me. 2014) (finding disclaimer of implied warranty of merchantability insufficient where it did "not mention merchantability").

Second, the purported disclaimer is not "written in bold print" or "all uppercase letters." *See Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Texas*, 249 S.W.3d 480, 490 (Tex. App. 2008); *U.S. Armament Corp. v. Charlie Thomas Leasing Co.*, 661 S.W.2d 197, 200 (Tex. App. 1983) (finding disclaimer of implied warranty ineffective because it was not in "conspicuous type," even where disclaimer used the phrase "no representation or warranties, expressed or implied, as to any item of equipment"); *Am. Aerial Servs.*, 39 F. Supp. 3d at 108 (disclaimer insufficient where it "does not appear in capital letters; does not appear in type that is larger than the surrounding text; . . . and does not appear in a contrasting font or color compared to the surrounding text").

Third, the purported disclaimer is preceded by a bold print heading stating "Warranty," rather than "No Warranty," suggesting the clause would affirmatively create a warranty rather than disclaim one. *See Morgan Bldgs.*, 249 S.W.3d at 490 (header for valid written disclaimer stated "No Warranty/No Consequential or Incidental Damages"). Indeed, the "Warranty" section begins in its first sentence by *providing* a warranty rather than disclaiming one, expressly warranting Dynamic's "materials and workmanship against defects for a period of (1) one year." ECF No. 27-2 at 3. The sentence following this first sentence furthers indicates the entire "Warranty" section provided a warranty: "Failure to follow maintenance suggestions will *void this warranty*." *Id.* (emphasis

19

added). Only a very close reading of the "Warranty" section would reveal the disclaimer hidden within the middle of the paragraph.

Therefore, the purported disclaimer of the implied warranty of fitness for a particular purpose is inadequately conspicuous.

Dynamic raises an argument regarding consistency between the express and implied warranties. However, I cannot resolve whether the express warranty limits the scope of the implied warranty at this stage because the existence of an express warranty is a question for the trier of fact. *See Cuthbertson*, 448 A.2d at 320; *PPG Indus.*, 146 S.W.3d at 100. Dynamic's motion to dismiss the implied warranty claims is denied.

## IV.    Negligence and Negligent Misrepresentation

XL raises two tort claims for negligence and negligent misrepresentation. Both parties argue these claims under Maine law, and I agree. As described earlier, choice-of-law provisions do not automatically apply to non-contract tort claims. *See Dinan v. Alpha Networks, Inc.*, 764 F.3d 64, 68 (1st Cir. 2014). But if a tort "claim called for enforcing obligations arising from the terms" of a contract, the choice-of-law provision could apply. *Id.* Here, the tort claims are premised on obligations arising outside the terms of the contract. ECF No. 30 at 10 ("XL's alternative theory presupposes that Dynamic's obligation arose outside of the written agreement . . . ."). Therefore, the Agreement's choice-of-law provision does not apply.

Instead, Maine law applies because Maine has the "most significant relationship" to the alleged tort. *F. Fin. Grp. Liab. Co. v. President, Fellows of Harvard Coll.*, 173 F. Supp. 2d 72, 86 (D. Me. 2001) (explaining that federal courts sitting in diversity apply forum state choice-of-law rules, and Maine applies the "most significant relationship" test). The damage occurred in Maine, Dynamic installed the flooring in Maine, and the

parties entered their contract while in Maine. Texas has a more attenuated relationship because it is the state of only one party's citizenship and is connected only to the contract claims—not the tort claims—through the choice-of-law clause. North Carolina has no relationship to this case beyond XL's citizenship. Therefore, Maine law applies.

Dynamic argues the economic loss doctrine, which "prohibits the recovery of purely economic losses in tort actions," bars both the negligence and negligent misrepresentation claims. *Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp. 2d 139, 142 (D. Me. 1999). The economic loss doctrine "marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others." *Id.* The practical effect of the doctrine is that "parties are left to their contractual remedies in cases seeking recovery of economic losses—the cost of repair, replacement, or loss of use." *Id.* Maine has adopted the economic loss doctrine for both negligence and negligent misrepresentation claims. *See Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 269 (Me. 1995).

While Maine courts have not directly addressed the scope of the doctrine, this Court previously has found that Maine likely would apply the doctrine to claims involving "commercial entities able to bargain over the terms of their agreement" where there was "no risk of harm either to people or to other property." *Maine Rubber Int'l v. Env't Mgmt. Grp., Inc.*, 298 F. Supp. 2d 133, 138 (D. Me. 2004). The economic loss doctrine also applies to construction disputes between commercial entities, where the "dispute is over the 'value and quality of what was purchased.'" *Schmid Pipeline Const., Inc. v. Summit Nat. Gas of Me., Inc.*, No. 13-CV-464, 2014 WL 3600437, at *4 (D. Me. July 22, 2014) (adopting recommended decision).

21

However, if a negligence claim is premised on a duty unrelated to the contract, the economic loss doctrine does not bar recovery in tort. *C & M Prop. Mgmt., LLC v. Moark, LLC*, No. 15-cv-336, 2016 WL 1298098, at *4 (D. Me. Mar. 31, 2016). The underlying question is whether the negligence claim concerns the "value and quality of [the] goods or services" contracted for, *id.*—that is, "[w]hether a product has injured only itself." *Peachtree*, 659 A.2d at 271. Maine courts "look to the product purchased by the plaintiff, as opposed to the product sold by the defendant, to determine whether a product has injured only itself." *Id.* In practice, that means if a plaintiff purchases a completed product which suffers damage, tort recovery is barred; if a plaintiff purchases only component parts which damage the completed product, tort recovery is permitted. *Id.* (gathering example cases). For example, in *Peachtree*, the plaintiffs who "purchased finished condominium units" damaged by defective windows could not recover in tort because the "the damages caused by any defects in the windows constituted damage only to the product [the entire condominium] itself." *Id.* Had the plaintiffs purchased only the windows alone, they would have been able to recover.

Here, the negligence claim concerns the value and quality of the flooring as installed. XL does not claim that the flooring caused any person injury or damaged any other part of the facility. Rather, XL seeks to recover for damage to what it purchased—both the flooring and its installation. ECF No. 26 at 10, ¶ 89 ("It was a natural and foreseeable consequence . . . that the product would fail."). Therefore, the economic loss doctrine bars XL's negligence claim, and that claim is dismissed.

On the other hand, the negligent misrepresentation claim primarily concerns Dynamic's alleged inducement of XL into the contract, not the value and quality of the flooring itself. While Maine courts have not directly addressed this issue, "[m]any courts

have distinguished those negligent misrepresentation claims that center upon an alleged inducement to enter into a contract from those that focus upon performance of the contract." *Wyle v. Lees*, 33 A.3d 1187, 1191 (N.H. 2011). I agree. As the Tenth Circuit explained,

> Where a negligence claim is based only on breach of a contractual duty, the law of contract . . . limits the breaching party's liability to damages that naturally flow from the breach. [However, where] one party . . . has negligently given false information with knowledge that the other party would act in reliance on that information . . . [the breaching party] is a tortfeasor and may not utilize the law of contract to shield liability in tort for the party's deliberate or negligent misrepresentations.

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001). That reasoning comports with Maine's view that the economic loss doctrine is intended to recognize the contracting parties' negotiated expectation of product value. *See Peachtree*, 659 A.2d at 270. If the contracting parties relied on negligently misrepresented information, there is no reason for courts to limit "the aggrieved party's recourse . . . [to] the terms of the contract" the aggrieved party would not have agreed to absent the misrepresentation. *Schmid*, 2014 WL 3600437, at *4. Moreover, on at least one occasion, this Court has permitted negligent misrepresentation claims—alongside fraudulent misrepresentation claims—to go forward in the face of an economic loss doctrine argument. *See Redzone Wireless, LLC v. NETGEAR, Inc.*, No. 16-CV-00595, 2019 WL 10255541, at *8 (D. Me. Sept. 20, 2019) (focusing on the fraudulent misrepresentation aspect of the allegations).

Dynamic characterizes XL's argument as relying on an unpleaded fraudulent inducement theory, not a negligent misrepresentation theory. See ECF No. 31 at 7. But XL is not attempting to argue fraud (indeed, the word fraud does not appear in XL's brief). Rather, XL claims that it relied on Mr. Foray's negligent misrepresentations in

contracting with Dynamic. While Dynamic is correct that a claim based on fraud would be improper because XL failed to plead it, Dynamic provides no substantive response to XL's negligent misrepresentation theory.

As described earlier, the sequence of events surrounding XL and Dynamic's contractual relationship is not clear. At this stage, making all inferences in XL's favor, the Court takes XL's allegation that it relied on Mr. Foray's testing in contracting with Dynamic as true. Therefore, Dynamic's motion to dismiss XL's negligent misrepresentation claim is denied.

## CONCLUSION

For the foregoing reasons, Dynamic's motion to dismiss is GRANTED IN PART and DENIED IN PART as follows:

- The motion to dismiss XL's claim for breach of contract:
  - As to the bubbling and unevenness in the flooring is GRANTED.
  - As to the paint chipping is DENIED.
- The motion to dismiss XL's claim for unjust enrichment is GRANTED.
- The motion to dismiss XL's claims for breach of express warranty is DENIED.
- The motion to dismiss XL's claims for breach of implied warranty is DENIED.
- The motion to dismiss XL's claim for negligence is GRANTED.
- The motion to dismiss XL's claim for negligent misrepresentation is DENIED.

**SO ORDERED.**

Dated this 27th day of May, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**